[No. A033763. First Dist., Div. Two. Aug. 21, 1987.]

FLORA ELISA SEERING et al., Plaintiffs and Appellants, v. DEPARTMENT OF SOCIAL SERVICES, Defendant and Respondent.

**COUNSEL**

Linda Fullerton for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, and Stephanie Wald, Deputy Attorney General, for Defendant and Respondent.

**Opinion**

**SMITH, J.**—

### I. *Introduction*

Flora and William Seering appeal from a judgment denying their petition for a writ of mandate to require the Department of Social Services (Department) to set aside its decision revoking their license to operate a family day care home for children.

On September 6, 1984, the Seerings' license was suspended on a finding by the Department that continued operation of the facility would pose a substantial threat to the health and safety of the children in their care. The suspension was based primarily upon allegations that William Seering had sexually abused a four-and-one-half-year-old girl in his care, A.

The suspension was appealed. Following a five-day evidentiary hearing before an administrative law judge (ALJ), the Department adopted the ALJ's proposed decision revoking the Seerings' license on April 16, 1985. On May 16, 1985, the Seerings petitioned the court below for a writ of mandate to overturn the Department's decision. Following a hearing, the trial court issued its statement of decision and judgment denying the petition for a writ of mandate on December 18, 1985. This timely appeal followed.

 The trial court applied the "independent judgment" test[1] in its review of the administrative record and made the following findings: "As to the facts, the court finds that the four and a half year old minor [A.] did attend the petitioners' day care facility from late September or early October of 1983 until December 2, 1983. During that time, petitioner William R. Seering penetrated the minor's vagina with a needle of uncertain length causing injuries to the minor's hymeneal [*sic*] ring. Petitioner William R. Seering tied the minor to a chair, exposed his penis to her, placed his penis against her body, placed his fingers or finger in her vaginal and anal area[s] and threatened her with very bad physical harm if she revealed any of this to anyone. Petitioners took photographs of the minor in a prone position on the floor so as to reveal a side view of her hip. Further,

---

[1] This was the proper standard. A trial court must exercise its independent judgment upon the evidence if the decision of an administrative agency substantially affects a fundamental vested right. (*Berlinghieri* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 392, 395 [188 Cal.Rptr. 891, 657 P.2d 383].) The right to engage in an occupation is such a right. (*Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 294, fn. 12 [188 Cal.Rptr. 590, 656 P.2d 554].)

the court independently finds that the weight of the evidence supports each of the above ALJ's findings for the agency."

On appeal, the Seerings contend that the ALJ's decision to exclude them from the hearing during A.'s testimony was erroneous and that the testimony of A.'s psychiatrist, Dr. Corwin, expressing his opinion that A. had been molested, was improperly admitted into evidence. We find no merit in the first contention. We do find that a portion of Dr. Corwin's testimony was improperly admitted but find the error nonprejudicial.

## II. *The Decision to Exclude the Seerings During A.'s Testimony*

At a prehearing conference held on March 21, 1985, an ALJ ruled upon the Department's motion to exclude the Seerings from the hearing room during A.'s testimony. A declaration of A.'s psychiatrist, Dr. David Corwin, was filed in support of the motion. Dr. Corwin stated that in his opinion because of threats made to A. by William Seering and the trauma she had endured, requiring her to testify in the physical presence of the Seerings would carry "a risk that she would incur additional injury" and would "likely raise her level of fear." Dr. Corwin further stated: "While logically Mr. Seering cannot injure [A.], [A.] is not able to view the situation logically. It has been too short a time and she is too young to know that Mr. Seering cannot injure her. Emotionally, she cannot differentiate between the logical explanation that he cannot hurt her and the emotional knowledge that he can hurt her as he has hurt her in the past." The ALJ ordered William Seering excluded from the hearing room and provided that Seering could view A.'s testimony on live, closed circuit television and that the Seerings' counsel could confer with William prior to the commencement of his cross-examination of A. The ALJ also ruled that Flora Seering was entitled to be present in the hearing room during A.'s testimony.

The actual hearing took place on March 25, 26, 27, 28 and 29, 1985. A. testified on March 25 and, pursuant to the previous order, William Seering was not present during her testimony. The minor began her testimony in the presence of her mother, the ALJ, counsel for both sides and Flora Seering. As her testimony progressed the ALJ apparently felt that she was having difficulty testifying. In response to questions from the ALJ, A. stated that she was afraid and would feel better if Flora Seering was not present. The ALJ then stated: "I have a feeling A. is intimidated by the presence of Mrs. Seering. . . . I'm just wondering now whether or not we might get some different testimony if Mrs. Seering is not here." At that point the ALJ excluded Mrs. Seering from the hearing room, over the Seerings' objection.

Arrangements were made to have her view the testimony on the closed circuit television and to confer with counsel prior to cross-examination.

 The Seerings contend that their exclusion from the hearing room during A.'s testimony denied them their statutory and due process rights to confrontation of a witness.

 "The express constitutional right to confrontation is confined to criminal proceedings. Nevertheless, in civil proceedings a party has a due process right under the Fifth and Fourteenth Amendments to the federal Constitution to cross-examine and confront witnesses. [Citations.]" (*In re Mary S.* (1986) 186 Cal.App.3d 414, 419, fn. omitted [230 Cal.Rptr. 726].) The same right is afforded by statute in a state agency hearing which involves the revocation of an individual's license. (Gov. Code, § 11500, subd. (f)(2).) "Unlike at a criminal proceeding where an express constitutional right to confrontation exists, at a civil proceeding the constitutional right involves general notions of procedural due process." (*In re Mary S., supra,* 186 Cal.App.3d at p. 419.)

The *In re Mary S.* court rejected the contention of a father that his right of confrontation had been violated when he was excluded from the court room during the testimony of his two children in a dependency proceeding under Welfare and Institutions Code section 300. The minors had preliminarily testified in chambers, outside of their parents' presence but in the presence of all counsel, and expressed their fears of testifying in front of their parents. The court then ruled that the minors should testify outside of their parents' presence, stating that it would recess at any time if the attorneys needed to contact the parents to discuss the minors' testimony.[2] (*In re Mary S., supra,* 186 Cal.App.3d 414, 417.)

 The Court of Appeal held that the father's right of confrontation was adequately protected by his counsel's cross-examination, holding that there was no fundamental right to physically confront the minor witnesses face-to-face in such a proceeding. (*Id.,* at pp. 419-421.) The Seerings contend that the rationale of *In re Mary S.* is not applicable here because that case involved a dependency proceeding in which the paramount concern was the minors' welfare while this case involves an attempt to deprive the Seerings of their liberty interest in their right to engage in an occupation and in their reputations. In both *Mary S.* and this case, however, the interest to be served by the procedure used was the ascertainment of truth without undue psychological harm to young minor witnesses who were

---

[2] It appears that, unlike here, no closed circuit television was used. Thus the excluded parties could not see or hear the testimony of the children.

demonstrably afraid. In *Mary S.* the children testified that they would be afraid to and unable to testify fully in front of their parents. (*Id.,* at p. 417.) Here Dr. Corwin submitted a declaration stating that A. would be frightened to testify in front of William Seering, and A. herself testified in response to questioning from the ALJ that she was afraid to testify in front of Flora Seering. The countervailing interest in this case is the Seerings' stake in their license to engage in operating a day care center. The countervailing interest in *Mary S.* was the parents' right not to be separated from their children, certainly a right no less important than that of the Seerings here. We thus reject the Seerings' contention that *In re Mary S.* is not supportive of the Department's position.

The Seerings rely upon *Herbert* v. *Superior Court* (1981) 117 Cal.App.3d 661 [208 Cal.Rptr. 273], *Hochheiser* v. *Superior Court* (1984) 161 Cal.App.3d 777 [208 Cal.Rptr. 273] and *Jennings* v. *Jones* (1985) 165 Cal.App.3d 1083 [212 Cal.Rptr. 134]. We find each of these cases inapposite.

In *Herbert,* the Court of Appeal held that a defendant in a criminal proceeding had been denied his federal and state constitutional rights of confrontation when, at the direction of the magistrate in a preliminary examination, he was so seated that he could hear but not see the witness, a five-year-old girl against whom the defendant was charged with committing sexual offenses. This decision was based upon the express constitutional rights to confrontation applicable in criminal proceedings pursuant to the Sixth Amendment and to article I, section 15 of the California Constitution. (117 Cal.App.3d 661, 665-667.) That case did not purport to establish any principle applicable in civil proceedings and is not controlling here.

*Hochheiser* v. *Superior Court, supra,* 161 Cal.App.3d 777, similarly involved the right of confrontation in a criminal proceeding and, like *Herbert,* is distinguishable on that basis. It held that the trial court did not have the inherent power to order that the complaining minor witnesses testify via closed circuit television, feeling that "such a far-reaching innovation in a *criminal trial*" should be left to the Legislature. (*Id.,* at p. 783, italics added.)

*Jennings* v. *Jones, supra,* 165 Cal.App.3d 1083, is in no way applicable to the present case. It did not involve the testimony of a minor who had allegedly been sexually abused. That was an action by general assistance recipients contending, inter alia, that a county's pretermination hearing mechanism violated procedural due process. The decision to terminate benefits was made by a caseworker who did not appear at the hearing and no procedure existed to require his or her attendance. Another employee of

the welfare agency merely appeared at the hearing with a case file. The Court of Appeal found this procedure deficient, primarily because one "cannot cross-examine a file" and there could be no meaningful cross-examination of a temporary custodian of the file who did not participate in the decision to deny benefits and who had no independent knowledge of the case. (*Id.,* at p. 1090.) Here, in contrast, the major witness was present, was available for cross-examination and was cross-examined extensively.

The Seerings also contend that the trial court improperly relied upon Penal Code section 1347 to exclude them from the hearing during A.'s testimony.[3] The trial court's statement of decision, however, reveals that it did not rely upon this section, which was not even in effect at the time of the administrative hearing, as actually authorizing the procedure used in this case. The trial court merely noted that Penal Code section 1347 "now permits a similar procedure in criminal cases (albeit it is the minor witness who is outside of the courtroom and who testifies on closed-circuit television that is broadcast into the courtroom)." It is obvious that the trial court was simply taking note of this statute by way of analogy in making its own determination that closed circuit television could properly be used in the circumstances of this case without violating the Seerings' due process rights.

### III. *The Testimony of Dr. Corwin*

A.'s psychiatrist, Dr. Corwin, testified at the administrative hearing that he believed that A. "had been molested." Video tapes of three therapy sessions of A. with Dr. Corwin were also admitted into evidence. ▆▆ ▆▆ The Seerings contend that Dr. Corwin was improperly permitted to give his opinion that the Seerings were the molesters and that he was improperly permitted to testify that in his opinion A. had been molested because he viewed her behavior as consistent with the "child sexual abuse accommodation syndrome" (CSAAS).

▆▆ The Department concedes that a psychiatrist's opinion that a specific third person or persons had committed a molestation is inadmissible. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1118-1120 [200 Cal.Rptr. 789]; *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1100, fn. 4 [215 Cal.Rptr. 45].) It urges, however, that Dr. Corwin did not testify that the Seerings were the molesters of A., but only that she had been molested. The

---

[3] Penal Code section 1347, which became effective May 20, 1985, permits the limited use of two-way closed circuit television in criminal proceedings in which the testimony of a minor will involve recitation of the facts of an alleged sexual offense. Such testimony may be taken out of the physical presence of the judge, the jury, the defendant and attorneys. (See also Pen. Code, § 868.7, which we construed in *Eversole* v. *Superior Court* (1983) 148 Cal.App.3d 188 [195 Cal.Rptr. 816].)

trial court specifically addressed this issue: "[P]etitioners argue that Dr. Corwin was permitted improperly to give his opinion that the petitioners were the molesters. The evidence simply does not support this statement. There is not to be found in the entire transcript a question asking for this opinion nor an objection to such a question. Dr. Corwin testified to the minor's hearsay statements in formulating his opinion as to her condition, but he did not testify that, on the basis of her statements, he was giving his opinion as to who was responsible for the molest." The Seerings have not cited to this court any portion of the administrative hearing transcript in support of their contention that Dr. Corwin testified that they, or either of them, were the molesters. We find no error in the trial court's ruling on this issue.

 Lastly, the Seerings contend that Dr. Corwin's expert opinion testimony that A. had been sexually molested was improperly admitted into evidence because he relied upon the CSAAS in reaching his opinion and the Department did not demonstrate that this "scientific method of proof" has been generally accepted as reliable in the scientific community in which it was developed.

In analyzing this contention we are guided by *In re Amber B.* (1987) 191 Cal.App.3d 682 [236 Cal.Rptr. 623] and *In re Christine C.* (1987) 191 Cal.App.3d 676 [236 Cal.Rptr. 630], recent decisions of Division Five of this court concerning the admissibility of expert psychological and psychiatric testimony in proceedings under Welfare and Institutions Code section 300.

In *Amber B.* a father challenged a court order which declared his daughters, aged one and three, dependents of the court under Welfare and Institutions Code section 300. In that case the Department of Social Services presented the testimony of a psychologist, Dr. Raming, who stated that in his opinion Amber had been sexually molested. This opinion was based upon Dr. Raming's observation of the child's behavior with an anatomically correct doll and his analysis of the child's reports of abuse. The court stated that the fundamental issue was "whether the technique employed by Dr. Raming for detecting child sexual abuse is a new scientific method of proof which must satisfy the *Kelly-Frye* test of admissibility, or whether Dr. Raming simply gave expert testimony to which the test does not apply." *(In re Amber B., supra,* 191 Cal.App.3d 682, 687; see *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013.) "Under the *Kelly-Frye* rule, evidence based on a new scientific method of proof is admissible only upon a showing that the procedure has been generally accepted as reliable in the scientific

community in which it was developed." (*In re Amber B., supra,* 191 Cal.App.3d 682, 686, citations and footnote omitted.)

The *Amber B.* court focused its discussion on whether the purpose of the *Kelly-Frye* rule would be served by applying it to testimony such as that of Dr. Raming. The court observed that the purpose of the *Kelly-Frye* rule "is to prevent fact finders from being misled by the 'aura of infallibility' that may surround unproven scientific methods." (*Id.,* at p. 690, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) It reasoned that an expert opinion based upon observation of the child's behavior with anatomically correct dolls and analysis of the child's reports of abuse would be "beyond the scope of critical analysis by the average lay person." (*Id.,* at p. 691.) With respect to the nature of Amber's reports of abuse, Dr. Raming stated that it is " 'fairly well documented in the literature . . . that children who have been molested will talk about being abused, but they will do this by consistently giving the . . . same facts or the essence in different words such that they have an event or an experience in their minds and are not merely repeating . . . rote by rote, someone else's words . . . .' " (*In re Amber B., supra,* 191 Cal.App.3d at p. 685.) With respect to behavior with the anatomically correct doll, Dr. Raming stated that Amber's behavior " '[was] fairly consistent with molested children. This is not the usual type of behavior one would see in children who are in a stage of age appropriate sex exploration. . . . [W]hen children this age describe or graphically demonstrate anal or vaginal penetration, it's pretty much assumed that the child learned that from experience and not from . . . sex exploration with other children.' " (*Ibid.*)

The court concluded that the *Kelly-Frye* rule should apply to Dr. Raming's testimony since a fact finder would be inclined to "ascribe 'an inordinately high degree of certainty' " to such an opinion. (*Id.,* at p. 691, quoting *People v. McDonald, supra,* 37 Cal.3d 351, 372.) The *Amber B.* court distinguished between this type of proof based upon a "scientific method" and a situation in which an expert merely gives his personal opinion: "Unlike with expert testimony where a witness gives a personal opinion, triers of fact are in no position to temper their acceptance of the psychological evidence 'with a healthy skepticism born of their knowledge that all human beings are fallible.' " (*Ibid.*)

The *Kelly-Frye* rule was not satisfied in *Amber B.* because the Department of Social Services made no attempt to establish general acceptance in the relevant scientific community. The error there could not "be characterized as harmless, because the Department's entire case was based upon Dr. Raming's analysis of Amber's reports of abuse and her behavior with anatomically correct dolls." (*In re Amber B., supra,* 191 Cal.App.3d 682, 691.)

The same court also applied the *Kelly-Frye* rule in *In re Christine C.,* *supra,* 191 Cal.App.3d 676. In that case Dr. David Corwin, the psychiatrist who testified for the Department in this case, testified that he believed the claims of twin children that they had been sexually molested by their father when they were three years old. "Dr. Corwin's conclusion was based primarily on 'what the children told me' and 'the way in which they told me.' Specifically, he relied on the consistency of their reports of abuse and the manner in which they reported the abuse, their demonstration of emotion during the interview, the absence of any deprecation of their father, their demonstrated ability to discriminate between events that did or did not occur, their behavior with anatomically correct dolls, and the general 'air of realism' in their assertions." (*Id.,* at p. 678.) The Department of Social Services also presented testimony of another therapist and two social workers that the children's claims of abuse were true. The court noted that "[t]he expert witnesses occasionally described behavior by [the children] which appears similar to some of the elements of 'child sexual abuse accommodation syndrome . . .' but none of the witnesses asserted this theory or described its elements." (*Id.,* at p. 679, fn. 2.)

Relying upon the reasoning of *In re Amber B.,* the court in *Christine C.* held that it was error to admit the expert opinion testimony without requiring a showing of general acceptance in the relevant scientific community of the practice of detecting child sexual abuse by observing a child's behavior with anatomically correct dolls and by analyzing the child's reports of abuse. (*In re Christine C., supra,* 191 Cal.App.3d 676, 679-680.) The error in *Christine C.* was, however, harmless since the trial court had stated flatly that it found the children to be "believable," accepted the basic premise of the father's defense without ruling in his favor and rejected Dr. Corwin's most forcefully asserted conclusions regarding intercourse and fellatio.

The Seerings contend that by analogy to the reasoning of *Amber B.* and *Christine C.,* we should hold it was error to admit Dr. Corwin's testimony that A. had been abused in this case because the Department did not demonstrate CSAAS is generally accepted in the relevant scientific community in accordance with *Kelly-Frye.* We first address two threshold issues raised by the Department. It contends that the *Kelly-Frye* issue was not raised in the proceedings below and should therefore not be reviewed by this court. The Seerings made a motion *in limine* in the administrative proceeding in which they expressly requested that Dr. Corwin be precluded from testifying that in his opinion A. had been sexually molested because she exhibited symptoms or behavior generally recognized as common to victims of molestation. The Department correctly points out that the Seerings did not specifically mention *Kelly-Frye* by name. They did, however, contend that such evidence would not be sufficiently "scientific" to be ad-

missible and relied upon *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], in which the Supreme Court applied the *Kelly-Frye* rule to hold evidence of "rape trauma syndrome" inadmissible to prove that a rape occurred. Thus the *Kelly-Frye* issue was properly raised below and is properly before us.

▇ The Department also contends that *Kelly-Frye* should not apply in an administrative proceeding to revoke a license because less strict rules of evidence apply in such proceedings. While it is true that an administrative hearing "need not be conducted according to technical rules relating to evidence and witnesses" and that hearsay is admissible in such a hearing (see Gov. Code, § 11513, subd. (c)), we conclude that the purpose of the *Kelly-Frye* rule will be served by applying it in this context. In *Amber B.* and *Christine C.,* the court was concerned that the trial judge in a dependency hearing might be misled by the "aura of infallibility" that may surround unproven scientific methods and might "ascribe an inordinately high degree of certainty" to the expert's opinion. We see no reason why an administrative law judge in a proceeding to revoke a license, and later a trial judge reviewing the administrative record under the independent judgment standard, would be any less likely to be misled by the "aura of infallibilty" with which the courts have been concerned. Consequently, we reject the contention that the *Kelly-Frye* rule should not apply in a proceeding such as this.

In a decision applying the *Kelly-Frye* test to hypnosis, the California Supreme Court said, "[W]e do not doubt that if testimony based on a new scientific process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the *Frye* standard of admissibility." (*People* v. *Shirley* (1982) 31 Cal.3d 18, 53 [181 Cal.Rptr. 243, 641 P.2d 775].) The Supreme Court in *People* v. *Bledsoe, supra,* 36 Cal.3d 236, quoted this statement from *Shirley* in determining to apply the *Kelly-Frye* test to a counselor's opinion that an alleged victim was suffering from rape trauma syndrome. The court disapproved admission of the testimony because it found that the rape trauma syndrome theory had been developed as a therapeutic tool and was not relied upon in the relevant scientific community as a reliable means of determining whether a rape had in fact occurred. (*People* v. *Bledsoe, supra,* 36 Cal.3d at pp. 249-251.)

The Court of Appeal in *Amber B.* and *Christine C.* found that the methods of proof relied upon by the expert witnesses in those cases were closely analogous to that in *Bledsoe.* The *Amber B.* court stated, "The method of proof relied upon by Dr. Raming is closely analogous to that in *Bledsoe,* because in both cases the expert witnesses relied upon a psychological analysis of a subject's behavior to determine whether sexual abuse had

previously occurred." (*In re Amber B., supra,* 191 Cal App.3d 682, 688.). ▇▇▇ We find that the expert testimony of Dr. Corwin in this case, based upon CSAAS, that A. had been abused is sufficiently analogous to the methods of proof relied upon in *Bledsoe, Amber B.,* and *Christine C.* to require that it be subjected to the *Kelly-Frye* standard of admissibility. As discussed *infra,* however, we also conclude that Dr. Corwin's personal opinion based only upon his own experience was properly admitted into evidence without the application of the *Kelly-Frye* test.

▇▇▇ " 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.* ' " (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30, quoting *Frye* v. *United States, supra,* 293 F. 1013, 1014.) "It is the proponent of [the expert] testimony, of course, who has the burden of making the necessary showing of compliance with *Frye,* i.e., of demonstrating by means of qualified and disinterested experts that the new technique is generally accepted as reliable in the relevant scientific community." (*People* v. *Shirley, supra,* 31 Cal.3d 18, 54, citing *People* v. *Kelly, supra,* 17 Cal.3d 24, 36-40.)

In *Kelly* the Supreme Court held that the reliability of voiceprint evidence had not been sufficiently established. The court there held that general acceptance in the relevant scientific community had not been shown where the evidence of such acceptance rested upon the testimony of a single witness and a serious question existed regarding the witness' ability fairly and impartially to assess the position of the scientific community. The court stated, "[W]e think it questionable whether the testimony of a single witness alone is ever sufficient to represent, or attest to, the views of an entire scientific community regarding the reliability of a new technique." (*Id.,* at p. 37.) The court was also concerned that the witness in that case was one of the leading proponents of voiceprint analysis, raising a question as to his ability to impartially assess the level of acceptance of the technique in the scientific community. (*Id.,* at p. 38.) We will review the record in this case under the guidelines set forth in *People* v. *Shirley, supra,* 31 Cal.3d 18, and *People* v. *Kelly, supra,* 17 Cal.3d 24, to determine whether the *Kelly-Frye* test has been met here with respect to Dr. Corwin's testimony based upon CSAAS.

Dr. Corwin first testified as to his credentials as an expert in child psychiatry. No issue has been taken with his qualifications as such an expert. He

further testified that A. and her parents had been referred to him in July 1984 by a sheriff's department investigator (later identified as Detective Terry Doreo). He first met with A. in the presence of her parents and Detective Doreo and videotaped that session. He saw her several times thereafter, estimating the number of times somewhere betweeen 10 and 20. A.'s parents were present during some of these sessions and some of the sessions were videotaped.

Dr. Corwin testified as to his personal opinion that A. had been abused. He stated that he had interviewed approximately 100 alleged victims of child sexual abuse in the preceding two years. He testified that based upon his interviews with and evaluation of A., in light of his own knowledge of the reactions of sexually molested children, he had formed an opinion that she had been sexually molested. He stated that he based that opinion "upon the history of the way in which she disclosed, and all of these things which I'm going to list are compared against what I know about, the way sexually molested children usually disclose and talk about and recall in therapy in the process . . . in my experience with such children." He also testified that some of A.'s problems with acting aggressively and having nightmares had been resolved during therapy and stated: "And that's further in my opinion as a therapist and child psychiatrist, that's always therapeutic evidence that there was validity [to claims of abuse], and we're dealing with something real here, as opposed to made up . . . ."

Dr. Corwin also testified that he believed that A. had been molested because she followed what would be a customary course in terms of her reaction to a molest "based upon probably the best empirical description we have, which is the Child Sexual Abuse Accommodation Syndrome, written by Dr. [Roland] Summit and published in the International Journal of Child Abuse and Neglect, which is the number one scientific journal; the editorial board consists of experts in the field and they review the articles. That syndrome discusses the secrecy and helplessness of kids [who have been molested]." Dr. Corwin stated that there were five components of CSAAS—secrecy, helplessness, compartmentalized accommodation (or denial), delayed disclosure and retraction. He described conflicting and unconvincing disclosures as typical of children suffering from the syndrome. He felt that one trait which related very much to A. was the psychological need to deny.

Dr. Summit's article was published in 1983. (Summit, *The Child Sexual Abuse Accommodation Syndrome* (1983) 7 Int'l. J. Child Abuse & Neglect 177.) According to Dr. Corwin's testimony, Dr. Summit had worked with abused children for at least 10 to 20 years. He was head of community consultation with the county hospital in Los Angeles, which allowed him to

both consult on specific cases and to work with treatment programs around the Los Angeles area. Dr. Summit was head consultant at the University of California at Los Angeles (UCLA) when Dr. Corwin was there and also served as head consultant with a number of other projects and programs. Dr. Corwin had done an internship and residency in psychiatry at UCLA from 1976-1979 and also was there under a fellowship from 1979-1981. While at UCLA, Dr. Corwin founded and directed the Los Angeles task force for interviewing sexually abused children, the role of which was to develop a protocol for interviewing children and videotaping the interview sessions.

The theory of CSAAS as described by Dr. Summit appears to be a relatively new concept. Dr. Corwin was not able to cite any specific studies or published reports demonstrating general acceptance of CSAAS in the relevant scientific community for the purpose of establishing the occurrence of sexual abuse. When asked whether in his experience CSAAS was generally accepted in the community of child sexual abuse experts, he replied, "I think it is."

■ We conclude on the basis of the record before us that the Department has not met its burden of demonstrating general acceptance of CSAAS in accordance with the *Kelly-Frye* standard of admissibility. We have here the view of only one expert who bases his opinion regarding CSAAS primarily on one article published four years ago by one of his former colleagues. The testifying expert, Dr. Corwin, was also the treating psychiatrist for the child involved in this proceeding. Some of the videotapes admitted into evidence disclose that he requested and received permission from A.'s parents to subsequently use the tapes in connection with educational activities or seminars. Dr. Corwin's own acceptance of CSAAS is apparent, but the evidence here does not demonstrate acceptance throughout the professional scientific community. We do not foreclose the possibility that in other proceedings it may be demonstrated that the theory of CSAAS is sufficiently accepted in the relevant scientific community to satisfy the *Kelly-Frye* standard. We hold only that the record herein does not demonstrate by means of disinterested experts that the new technique is generally accepted as reliable. (See *People* v. *Shirley, supra,* 31 Cal.3d 18, 54; *People* v. *Kelly, supra,* 17 Cal.3d 24, 36-40.) We must thus consider whether the failure to demonstrate compliance with the *Kelly-Frye* test with respect to Dr. Corwin's testimony based upon the theory of CSAAS constituted prejudicial error in the context of this case.

It is clear that Dr. Corwin's opinion that A. had been abused was based in part upon CSAAS. His testimony that he believed she had been abused because her behavior comported with the components of CSAAS was im-

properly admitted into evidence. We conclude, however, that in light of the entire record this error was not prejudicial.

In addition to his testimony based upon CSAAS, Dr. Corwin provided his own personal opinion as an expert child psychiatrist that A. had been abused based upon his interviews with her in light of his own experience. This testimony was properly admitted pursuant to Evidence Code section 801, which permits expert opinion testimony based on matter perceived by or personally known to the witness that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject in question. In our view, this is the type of "expert testimony where a witness gives a personal opinion" which the *Amber B.* court distinguished from proof based upon a "scientific method" which should be subject to the *Kelly-Frye* rule. (See *In re Amber B., supra,* 191 Cal.App.3d 682, 691.) Triers of fact can temper their acceptance of such a personal opinion " 'with a healthy skepticism born of their knowledge that all human beings are fallible.' " (*Ibid.,* quoting *People* v. *McDonald, supra,* 37 Cal.3d at p.372.) Although the court in *Amber B.* and *Christine C., supra,* 191 Cal.App.3d 676, spoke broadly in terms of subjecting psychological or psychiatric analyses of a child's reports of sexual abuse to the *Kelly-Frye* test of admissibility, it appears to us from a reading of those cases, including the distinction made between an expert's own personal opinion and an opinion based upon a scientific method of proof, that the court intended to subject expert opinion testimony to the *Kelly-Frye* rule only when the opinion was based upon a new method of proof of fact rather than being a personal opinion based upon the expert's own experience. We thus view our holding here as consistent with the views expressed in *Amber B.* and *Christine C.* To subject *all* expert testimony based upon analyses of reports of child sexual abuse to the *Kelly-Frye* test would severely limit the ability to present the personal opinion of a qualified expert in this field, since most such opinions are undoubtedly based, at least in part, upon such reports and in many, if not most, cases it would not be possible to demonstrate that the expert's own personal opinion would be generally accepted in the relevant scientific community.

The decision below is supported not only by the admissible portion of Dr. Corwin's testimony but also by the testimony of Dr. David Kerns, A. herself, A.'s mother and father and Detective Terry Doreo.

Dr. Kerns is a board certified pediatrician who has been involved in working with child abuse and child sexual abuse since approximately 1974. At the time of the hearing in this case he had been Medical Director of Ambulatory Services at Children's Hospital in Oakland for the preceding five years. He conducted a physical examination of A. in March 1985. He testified that she had a sharp angular defect of the hymen which in his

opinion was the result of an injury rather than an anatomical variation. He stated that this defect was an injury which "speaks for some sort of sharp object having done it." He also stated that such object, for example, might have been a needle, a knife or a fence post. Dr. Kern testified that the injury was at least several weeks old, but he could not pinpoint when it might have occurred. He stated that the injury could have occurred a year or a year-and-a-half earlier.

A. herself testified. Although there were some inconsistencies in her testimony, she did testify that Bill (William Seering) had hurt her between her legs with a needle, had tied her up, had touched her on her bottom and tee-tee (her word for vagina) and had hurt her very badly. A.'s mother and Detective Doreo testifed that A. had related to them similar reports of abuse. A.'s father testified that A. had told him of being photographed prone with her underwear partially removed while at the Seerings' home. Although the testimony of A.'s parents and of Detective Doreo was hearsay, hearsay is admissible in an administrative proceeding such as this. (Gov. Code, § 11513, subd. (c).) Their testimony is corroborative of the evidence presented by A., Dr. Kern and Dr. Corwin.

In light of the admissible evidence, we find it not reasonably probable a result more favorable to the Seerings would have been reached in the absence of the erroneous admission of Dr. Corwin's expert opinion testimony based upon CSAAS. The error does not require reversal. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *In re Christine C., supra,* 191 Cal.App.3d 676, 680-681.)

The judgment is affirmed.

Kline, P. J., and Benson, J., concurred.