Filed 8/7/13  P. v. Childs CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARTIS LEONARD CHILDS,<br><br>    Defendant and Appellant. | B236982<br><br> (Los Angeles County<br>  Super. Ct. No. VA109176) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Philip H. Hickok, Judge.  Affirmed.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Martis Leonard Childs appeals from a judgment sentencing him to a prison term of 90 years to life after a jury found him guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)) and attempted first degree murder (§§ 664/187, subd. (a)), and found to be true allegations that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that defendant personally discharged a handgun causing death and great bodily injury (§ 12022.53, subd. (d)). Defendant raises two issues on appeal. He contends: (1) the investigators employed impermissibly suggestive identification procedures with one of the witnesses, who was the only non-accomplice witness to identify defendant; and (2) the trial court improperly admitted dog scent identification evidence. We affirm the judgment.

## BACKGROUND

On the evening of February 6, 2006, a small group of young people stood in the driveway of a home on Pace Avenue in Los Angeles where Nathan Wheaton and his sister, Nikita Wheaton[2] lived with their mother and their brother. The group consisted of Nathan and Nikita; their next-door-neighbor, Joseph "J.B." Bryant; Bryant's cousin, Jermaine Scorza; Troy Daniel and his little brother, Antone; and Trarell M., who was 14 years old. At some point, they saw four men walking down Pace Avenue towards them. Before the men reached them, Nathan received a telephone call and went inside his house.

When the men reached the group, they stood in a semicircle in front of them. One of the men lifted his black hoodie sweatshirt to reveal a gun in his waistband.

---

[1]     Further undesignated statutory references are to the Penal Code.

[2]     We will refer to Nathan and Nikita Wheaton by their first names to avoid confusion.

One of the other men asked the group, "Where you from?" Several members of the group understood that to be a gang challenge. Daniel responded that they were not gang members. As the men came nearer, one of them, who was wearing a red leather jacket, recognized Daniel and shook his hand. The man who issued the gang challenge then began to check the pockets of everyone in the group to see what they had. When he tried to check Bryant's pockets, Bryant slapped his hands away and said something to him. The man tried again, and they started fighting. The fight moved out into the street, until the man with the gun pulled the gun out of his waistband and fired it at Bryant. Bryant tried to run away as the man continued to fire. Bryant fell, and the man stood over him and fired several more shots at him. Bryant was hit six times; two of the shots were fatal. Trarell, who was running north on Pace trying to get away, also was shot in the back, although he survived.

Nathan, who was inside the house when the fight began, went outside when Nikita ran in to tell him to call the police about the fight. Nathan saw people fighting in his driveway. Before he could get near them, the shooting started. He saw the shooter standing near the rear of a car parked on the street. After firing a total of seven or eight shots, the shooter and the other men took off running back the way they came. Nikita called 911 to report the shooting shortly before 8:54 p.m.

Deputy Sheriff Samuel Valente was on patrol that evening when he heard a call over his radio of a gunshot victim at 9418 Pace Avenue. He immediately punched into the patrol car's computer that he and his partner were responding, and they started driving toward that location. That entry was made at 2055 (i.e., 8:55 p.m.). As they drove, they saw a car driving southbound on Belhaven

3

Avenue, turning west onto 93rd Street without signaling.[3] Deputy Valente entered the car's license plate number into the computer; the time of that entry was 2058 (i.e., 8:58 p.m.). He and his partner pulled up alongside the car and saw the driver reaching into one of the air conditioning vents. They conducted a traffic stop, did a pat-down search of the driver, and checked the air conditioning vents, where they found a bag containing rock cocaine. Deputy Valente's partner searched the car, but did not impound it; no gun was found in the car. They arrested the driver, who said his name was Ronnie Lamont Dunn. In fact, the driver was defendant; Ronnie Dunn was defendant's older brother. Deputy Valente did not consider defendant to be a suspect in the shooting at that time.

Sergeant Richard Biddle of the Los Angeles County Sheriff's Department was called to investigate the shooting. When he arrived at the scene that evening, he saw there were several 9 millimeter shell casings on the ground. The casings were collected as evidence. Sergeant Biddle observed as one of the two dog handlers who were called to the scene, Edward Hamm, used a scent transfer unit (STU) to create scent pads from some of the casings. Hamm presented one of the pads to his dog, a bloodhound named Night, and told Night to "find him." Night began to follow a trail, and eventually ended up at an apartment complex between Belhaven Avenue and Hooper Avenue, just north of 93rd Street. The dog showed particular interest in a stairway at 9234 Belhaven Avenue, and an apartment at 9215 Hooper Avenue. The other dog handler, Joseph D'Allura, and his dog were called to that area. D'Allura presented one of the scent pads to his dog, Cooper, and told Cooper to locate that scent. Cooper alerted at the same two locations that Night had shown an interest in: a stairway at 9234 Belhaven, and the door to

---

[3]     The corner of Belhaven Avenue and 93rd Street is approximately a quarter-mile from the location of the shooting.

4

Apartment 1 at 9215 Hooper Avenue. Gregory Charles Moody lived in that apartment.

In addition to accompanying the dog handlers, Sergeant Biddle also interviewed witnesses to the shooting and obtained descriptions of the four men. Within a few days after the shooting, Nikita, Nathan, and Jermaine Scorza were shown photo-lineups, one of which included a picture of Moody, and another that included a picture of defendant taken upon his arrest on the night of the shooting.[4] None of them identified defendant or Moody as one of the men involved in the shooting incident. However, Scorza identified Levitius Wright as the person who pocket-checked everyone and fought with Bryant. A month later, after being shown additional photo-lineups, Nathan identified Markease Williams as the man in the red jacket who shook Troy Daniel's hand, and Scorza identified Carl Arline as another one of the men.

Sergeant Biddle interviewed Moody in May 2006. Moody told him that he saw defendant standing in front of his apartment complex with Jantay Smith and some other people within a few minutes after the shooting.[5] Moody said that he overheard defendant say, "I didn't mean to shoot that boy on Pace. I thought there was some Crips over there. I went over there because there was a shooting at 95th. The Crips were shooting at 95th earlier."

Sergeant Biddle and his partner met with Nathan again shortly after the interview with Moody, and showed him another photo-lineup. They asked Nathan if any of the photographs looked like the shooter. Nathan initially chose defendant's picture, but then also pointed to two other pictures, saying they all had

---

[4]     Defendant was not a suspect at that time; his photograph was included as a filler.

[5]     According to Sheriff's records, Jantay Smith was in jail at the time of the shooting, and was not released until a few days after the shooting.

a resemblance. When asked whether the first person he pointed to looked most like the person with the gun, he agreed, but he was not 100 percent sure. Sergeant Biddle's partner asked Nathan to fix his confidence level on a scale of one to 10, with 10 being that he is absolutely sure that the picture is of the shooter and one being that he is absolutely sure it is not the shooter. Nathan said his confidence level was probably six.

In September 2008, D'Allura and his dog, Cooper, participated in a scent lineup, using one of the scent pads Hamm made at the crime scene from one of the casings. Cooper matched that scent to a scent pad D'Allura made from a shirt taken from defendant a few weeks earlier.

In January 2010, defendant, Wright, Williams, and Arline were charged by information with one count of murder (§ 187, subd. (a)) and one count of attempted premeditated murder (§§ 664/187, subd. (a)), with gang and gun allegations (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b),(c),(d)) as to each count. In addition, the information included a prior conviction allegation against Williams under the Three Strikes law (§§ 667, subd. (b)-(i), 1170.12, subd. (a)-(d)), and prior prison term allegations against defendant, Wright, and Arline (§ 667.5, subd. (b)). Before trial, Williams and Arline entered into plea agreements; in exchange for their testimony at trial, Williams received an 11-year prison term, and Arline received a 16-year term.

Defendant was jointly tried with Wright. Nathan, Nikita, Scorza, Daniel, and Trarell testified about what they observed, and Nathan was questioned about his identification of defendant as the shooter.[6] Williams and Arline also testified about the events of that evening, and both testified that defendant was with them

---

[6] An audio recording of the interview at which Nathan made the identification was played for the jury; a transcript of the recording is included in the record on appeal.

when they approached the group on Pace Avenue and that defendant was the shooter.  In addition to the eyewitnesses, the prosecution presented the testimony of, among others, both dog handlers, Sergeant Biddle, and a gang expert.  Defendant did not present any witnesses.

The jury found defendant guilty on both counts, and found the gang and gun allegations to be true.  The trial court sentenced defendant to 25 years to life on the murder count, plus 25 years to life on the gun allegation, and a consecutive term of 15 years to life on the attempted murder count (with a gang enhancement), plus 25 years to life on the gun allegation, for a total of 90 years to life.  Defendant timely filed a notice of appeal from the judgment.

## DISCUSSION

A     *Suggestive Identification*

On May 24, 2006 – almost four months after the shooting, and shortly after Moody told Sergeant Biddle that he overheard defendant talking about shooting Bryant – Sergeant Biddle and his partner, Kent Wegener, met again with Nathan.  After engaging in some small talk, Wegener told Nathan, "Well we want you to look at a picture of the shooter. . . .  Because he's the one we haven't shown you yet."  Sergeant Biddle reminded Nathan about the admonishment that he or Wegener read to Nathan the last time they showed him a photo-lineup, and said he had to read it to him again.  After Wegener told Nathan to listen closely, Sergeant Biddle read the admonishment to Nathan.  The admonishment advised that the person involved in the crime may or may not be among the photographs being shown to him.

Before showing Nathan the photo-lineup, Wegener told Nathan to concentrate on what the shooter looked like, and reminded him that the shooter may or may not be among the photographs.  Nathan was presented with the photo-

7

lineup and Wegener asked if he recognized anyone. After looking at it for a short period of time, Nathan pointed to the photograph of defendant, which was in the lower left corner. Sergeant Biddle asked, "Which one? This one?" Nathan then pointed to two other photographs, indicating that those also looked similar. Sergeant Biddle asked, "Okay, but this one in the lower left resembles the guy you saw that night?" Nathan answered, "Yeah." Sergeant Biddle and Wegener asked him a few more questions about the photographs he pointed to, and tried to confirm that the photograph in the lower left looked most like the shooter. Wegener noted that Nathan indicated he was not totally sure about his identification of defendant's photograph, and asked Nathan to tell him, "on a scale of one to ten, if ten was you['re] absolutely sure that it's him and one is you're absolutely sure that it's not him, what number is he?" Nathan responded, "Probably six." Sergeant Biddle asked Nathan to write on the form, in his own words, that the lower left photograph looks the most like the shooter, with a confidence level of six on a scale of one to ten. Nathan wrote: "Lower left look could have like him but not sure."

Before trial, defendant moved to exclude evidence concerning Nathan's identification of defendant, arguing that the identification process was unduly suggestive. After reviewing a transcript of the interview during which Nathan made the identification, the court denied the motion, noting that defendant's argument went more to the weight of the identification evidence rather than its admissibility. On appeal, defendant argues his right to due process was violated because Sergeant Biddle and his partner used unduly suggestive photo-lineup procedures and pressured Nathan to make a positive identification of defendant as the shooter. We disagree.

"'[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness – i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure.'

8

[Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1250-1251.) Defendant contends Sergeant Biddle and his partner engaged in leading and suggestive comments at the start of the identification process by telling Nathan that they wanted him "to look at a picture of the shooter." While Wegener's initial statement was inartfully phrased, it was made in the context of explaining why they had asked Nathan to come back for an interview and which of the four men involved in the incident they wanted Nathan to try to identify. Most importantly, Sergeant Biddle immediately reminded Nathan of the admonition he read to him before previous photo-lineups, reread the admonition to him, and reiterated that the shooter may not be in the lineup.

To the extent defendant contends Sergeant Biddle and Wegener acted improperly by focusing on Nathan's identification of defendant's photograph rather than the other two photographs Nathan subsequently pointed to, his contention that that conduct violated his right to due process also fails. Sergeant Biddle and Wegener focused on defendant's photograph only *after* Nathan pointed to it, and they then attempted to determine Nathan's level of certainty about that identification. "Generally, a pretrial procedure will only be deemed unfair if it suggests in advance of a witness's identification the identity of the person suspected by the police." (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052; see also *People v. Hunt* (1977) 19 Cal.3d 888, 894 ["'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police'"].)

In short, defendant's right to due process was not violated by the trial court admitting evidence of Nathan's identification of defendant. The police officers did not suggest anything to Nathan in advance of his identification. The jury heard the recording of the interview at which the identification took place, and heard Nathan express his lack of certainty. As the trial court aptly noted, Nathan's uncertainty

9

and the officers' questioning of him went to the weight of identification, rather than its admissibility.

B      *Dog Scent Identification*

Before trial, the prosecutor filed a motion asking the trial court for permission to introduce dog tracking evidence and dog scent identification evidence at trial.  As part of the motion, the prosecutor asked the trial court to take judicial notice of *People v. Salcido*, Los Angeles Superior Court Case Number GA052057 (*Salcido*), in which another trial judge, Judge Michelle R. Rosenblatt, conducted an extensive hearing to determine (1) whether the STU (which Hamm used to create the scent pads from the casings found at the scene, both in *Salcido* and in the present case) meets the test of reliability under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*);[7] (2) whether human scent is unique; (3) how long scent will remain at a location; (4) how long captured scent will remain on a gauze pad; (5) whether, as a breed, bloodhounds have acute powers of scent and scent discrimination; (6) whether dogs can be trained to discriminate between scents, such as in a scent lineup; and (7) if so, whether certification procedures are adequate to ensure that scent discrimination dogs are properly trained and that dog handlers are properly trained.[8]  In her detailed ruling, Judge Rosenblatt found that

---

[7]      In *Kelly*, *supra*, 17 Cal.3d 24, the Supreme Court held that before evidence obtained through a new scientific technique may be admitted, it must be found to be reliable under a three-prong test.  There must be proof that (1) the technique is generally accepted as reliable in the relevant scientific community, (2) the witness testifying about the technique and its application is a properly qualified expert on the subject, and (3) the person performing the test in the particular case used correct scientific procedures. (*People v. Mitchell* (2003) 110 Cal.App.4th 772, 782.)

[8]      A copy of the motion is included in the augmented clerk's transcript.  Although the motion indicates that copies of the trial court's opinion in *Salcido*, the transcript of one of the expert's testimony, and a CD of the scientific literature the trial court

10

(1) the STU is generally accepted as reliable in the relevant scientific community; (2) the protocol that Hamm uses for cleaning and using the STU is generally accepted as reliable in the relevant scientific community; (3) experts have established to a reasonable scientific certainty that human scent is unique and that trained dogs can reliably distinguish between one scent and another; (4) experts have established that, for purposes of scent identification, scent can remain on an object for years, through bomb blasts, under water, and in the elements; (5) scent can remain on a gauze pad for several months, then slowly decreases, although the human scent pattern remains; (6) it is the training, rather than the breed, of the dog that makes a dog proficient in scent detection, identification, and discrimination; and (7) dogs can be trained to accurately discriminate between human scents, such as in a scent lineup.

At the hearing on the prosecutor's motion, the prosecutor argued that if the trial court took judicial notice of the proceedings and opinion in *Salcido*, there was no need for a *Kelly* hearing, and all that was necessary was an Evidence Code section 402 hearing (402 hearing) on the training and certifications of the dog and dog handler to establish a foundation for admission of the dog scent identification evidence. Counsel for defendant argued that a *Kelly* hearing was needed because new scientific articles and studies had come out since the hearing in *Salcido*. The trial court stated that it would take judicial notice of Judge Rosenblatt's opinion in *Salcido*, including its reasoning, and that a *Kelly* hearing would not be required unless defense counsel presented the court with post-*Salcido* studies or articles that disagreed with Judge Rosenblatt's findings.[9] Defense counsel noted that if the

_____

considered are attached to the motion, the augmented clerk's transcript includes only the trial court's opinion and one page of the index of the scientific literature.

[9] There is no indication in the record that defense counsel ever presented any post-*Salcido* studies or articles to the trial court.

11

court accepted Judge Rosenblatt's findings, he would challenge the foundation for the evidence at the 402 hearing.

At the 402 hearing, D'Allura testified that he had been a dog handler for the Los Angeles County Sheriff's Department from 1991 to 2001, at which point he became a contractor to the Department. He received training through the Department's Canine Unit Special Enforcement Bureau, and eventually became a trainer himself. He has been training dogs to discriminate human scent since 1996. He began training Cooper, the dog used in the scent identification lineup in the present case, when Cooper was three months old. Cooper received 3,500 to 4,000 hours of training in human scent searches, including training in matching human scents from objects that have been exploded, burned, melted, cleaned, or sterilized. He has participated in studies conducted by the FBI, and in 2002 he was certified by the Los Angeles Sheriff's Department in 2002 scent comparison.[10]

Cooper began working in criminal cases on scent comparisons in 2002, and between 2002 to 2008, he and Cooper worked on over 1300 cases, including 272 scent lineups. D'Allura was not aware of any lineups in which Cooper made an incorrect identification; he never received feedback from any investigator, prosecutor, or defense attorney that the person Cooper identified was not the suspect.

D'Allura explained the procedure he typically used (and used in the present case) to conduct scent lineups. D'Allura makes scent pads from three people who were not involved in the crime, and a scent pad from the suspect (in the present case, from defendant's shirt), all of which are stored separately in double zip-lock bags. He is then provided with a scent pad from the crime scene, which also is

---

[10]    At the 402 hearing, D'Allura testified that Cooper was certified in scent comparison in September 2002, but he did not identify the entity that certified him. He did, however, identify the entity when he testified before the jury.

kept in double zip-lock bags. For the lineup, D'Allura prepares four boxes. There is a 3-inch by 3-inch hole in the top of each box. D'Allura places one of the scent pads from the individuals (the three uninvolved people and the suspect) into each box. The four boxes are placed on the ground in a diamond, about eight to ten feet apart. He takes Cooper to the center of the diamond and presents the scent pad he wants matched. He unleashes Cooper, and Cooper goes to check the boxes. If Cooper finds a match, he will lie down next to the box. The first lineup he conducts is a proof lineup, in which Cooper is presented with a scent pad from one of the uninvolved individuals. If Cooper makes a correct identification, D'Allura conducts a second lineup using the scent pad from the crime scene.

At the 402 hearing, D'Allura testified that he had discussed his procedures with Dr. Adee Schoon, who is the foremost expert on scent lineups and scent canines, and that Dr. Schoon approved of those procedures. Another expert, Zhan Zooman, who is the commander of the Netherlands canine scent unit, observed D'Allura and Cooper work, and told D'Allura he was very impressed with Cooper's work.

At the close of the 402 hearing, the trial court found that a sufficient foundation had been laid to allow the dog scent identification evidence to be admitted. Defense counsel objected, stating: "I don't think they've laid a proper foundation for where they received this evidence, how the evidence was obtained and stored, to make a good scent lineup. I don't think they followed any certain procedure, . . . or any scientific procedure, to prevent contamination by the way it was stored. And so I don't think they laid a proper foundation to allow this scent identification to come in." The court overruled the objection.

In his testimony before the jury, D'Allura discussed his and Cooper's training and experience, and how the scent lineup was conducted in this case. He explained that before conducting the lineup, he obtained scent pads from three

13

inmate trustees who worked at a Sheriff's station and were the same race and gender as defendant. Each trustee wiped a sterile gauze pad on their arms and hands, placed the pad in a zip-lock bag, sealed it, placed that bag in another zip-lock bag, sealed it, and placed it in a manila envelope. He had one of the trustees make two scent pads, one of which would be used in the proof lineup. He placed the manila envelopes in a box with dividers and drove to the Homicide Bureau to conduct the scent lineup.

When he arrived at the Homicide Bureau, Sergeant Biddle gave him a plastic bag that contained a shirt. D'Allura placed a sterile gauze pad in the bag with the shirt and let it sit for 20 minutes, after which he removed the pad (while wearing gloves) and placed it in a bag and double-bagged it. After D'Allura, wearing gloves, placed the scent pads in the four boxes (three boxes had a scent pad from a trustee, and the fourth had the scent pad from the shirt), he marked the bottom of the box that had the scent pad from the shirt with a large X, and marked the bottom of the box that had the scent pad from the trustee who made two scent pads with a small X. He gave the boxes to the investigators, and he and Cooper left the area to wait in a parking lot around the corner while the investigators arranged the boxes in a diamond pattern on a grassy area next to the Homicide Bureau building.

When the boxes were in place, the investigators went inside the building to observe from behind one-way glass, and D'Allura was called to conduct the proof lineup. D'Allura took Cooper to the center of the diamond, let him smell the scent pad from the trustee who made two pads, and unleashed him. Cooper checked the boxes, and indicated that he made a match by lying down next to one of them. The investigators notified D'Allura that Cooper had made a correct identification. D'Allura and Cooper left the area again, and waited for 10 minutes to allow Cooper to decompress; D'Allura was not informed whether the investigators rearranged the boxes during this time. After that time, D'Allura was again called

14

to the area to conduct the scent lineup using the scent pad taken from one of the casings. Cooper matched that scent to a box, which D'Allura subsequently was told was the box containing the scent pad taken from defendant's shirt.

On appeal, defendant contends the trial court erred in allowing the dog scent identification evidence to be admitted because (1) there was insufficient evidence to establish the proficiency of the dog or his handler, and (2) D'Allura's testimony failed to establish that correct scientific procedures were employed in the collection and storing of the scent evidence used to make the identification. As to the first ground, defendant forfeited that issue by failing to object on that ground at the conclusion of the 402 hearing. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22 [defendant forfeited appellate claim of improper admission of evidence by failing to object at trial on specific ground argued on appeal; *People v. Mattson* (1990) 50 Cal.3d 826, 854 ["Specificity [of the grounds for objection] is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence"].) As to the second ground, there was sufficient evidence presented through other witnesses to establish that correct scientific procedures were employed in this case.

For example, defendant argues that D'Allura did not provide any information regarding his training in using the STU or how it was maintained. No doubt, that is because D'Allura did not use the STU to create the scent pad from the casings found at the crime scene. Instead, the other dog handler, Hamm, testified that he used the STU to create the scent pads, and that he followed all appropriate procedures with regard to cleaning the STU and collecting the scent; D'Allura testified that he was present when Hamm created them.

Defendant also argues that D'Allura failed to testify that he followed established protocols to avoid contamination when preparing, storing, or using the scent pads. But D'Allura did testify about the measures he took to avoid

15

contamination of any items that were in possession.  He testified that he wore gloves when handling any of the evidence, and that all of the scent pads were double-bagged in zip-lock bags.  To the extent defendant contends D'Allura did not testify about how the scent pads were stored when he was not using them, he is correct.  But Sergeant Biddle testified that he observed Hamm making the scent pads and placing them in double zip-lock bags, and that those bags were booked into evidence at the Sheriff's Homicide Bureau and then were brought to the Sheriff's Department central property room, where they were kept in a freezer.  He testified that the pads were removed from refrigeration on the morning of the scent lineup.

Finally, defendant argues that D'Allura did not know anything about the shirt that he was asked to use for the scent lineup.  Once again, defendant is correct that D'Allura had no knowledge about how that shirt was obtained and how it was stored.  But Sergeant Biddle testified that shortly before the scent lineup was conducted he went to Ironwood State prison and had defendant put his shirt into a plastic bag.  Sergeant Biddle took that bag and put it into another plastic bag and sealed it with a rubber band, then put it into a manila envelope and booked it into evidence at the Sheriff's Homicide Bureau.

In short, defendant's contention that a proper foundation was not laid regarding the collection, preparation, handling, and storage of the scent-related items is contrary to the record.  Thus, the trial court did not err in admitting the dog scent identification evidence.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.


17