Filed 2/23/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>GUADALUPE RIOS,<br><br>    Defendant and Appellant. | G061764<br><br>(Super. Ct. No. 19HF1708)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Robert A. Knox, Judge.  Affirmed in part and reversed in part.

Correen Ferrentino, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*     \*     \*

Under the *Kelly* rule, expert testimony based on the application of a new scientific technique is not admissible in a California court unless the proponent of the evidence shows: 1) the reliability of the technique is generally accepted in the relevant scientific community; 2) the expert testifying about the technique is properly qualified as a witness on the subject; and 3) the person who performed the test in the particular case used correct scientific procedures. (*People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*).)

A police officer found Guadalupe Rios with suspected methamphetamine and carisoprodol (Soma) pills. The officer further identified the substances using a presumptive test: a handheld laser device called a TruNarc identifier. The prosecution charged Rios with three crimes: possession for sale of methamphetamine, transportation for sale of methamphetamine, and simple possession of carisoprodol.

At trial, Rios challenged the reliability of the TruNarc test. In a pretrial hearing, the officer testified the device emits a laser that "excites a bond inside of a molecule. This bond will emit a light that is measurable by the laser. The laser will then analyze the substance, and it stores about 450 substances in its library, and it comes back with an accurate reading of what the substance is." The court allowed the officer's TruNarc testimony to be admitted at trial. A jury found Rios guilty of the three charged crimes. On appeal, Rios challenges the admission of the TruNarc evidence.

We hold that a laser narcotics identification test is based on a new scientific technique, the prosecution failed to establish its admissibility under the *Kelly* rule, and therefore it was error to admit the testimony about the TruNarc test at trial.

However, as to Rios' two methamphetamine convictions (possession for sale and transportation for sale), we find the error was not prejudicial. Because of other compelling evidence, there is <u>not</u> a reasonable probability of a more favorable result had the TruNarc evidence not been admitted at the trial. But as to Rios' carisoprodol conviction (simple possession), we find the evidentiary error was prejudicial and we reverse that conviction. In all other respects, the judgment is affirmed.

# I

## FACTS AND PROCEDURAL BACKGROUND

At about 8:45 a.m., an Irvine police officer was on patrol in a parking lot in an area known for narcotics activity. The officer watched a woman (later identified as Rios) enter the parking lot in a Lexus SUV. Rios parked the SUV and walked towards a store. The officer got out of his patrol vehicle and looked into the SUV. The officer saw a plastic baggie with white residue in the front passenger door pocket, just below the window. The officer immediately recognized the white residue as narcotics residue.

The officer returned to his patrol vehicle and watched as Rios eventually returned to her SUV and sat in the driver's seat. The officer approached and told Rios what he had seen in her vehicle. Rios did not seem surprised. The officer asked Rios if there was anything else illegal in the car. Rios initially said there was not, then she admitted "there was, in fact, methamphetamine in the vehicle." Rios pulled a small green box from the center console and handed it to the officer. The small cardboard box looked like a soap box from a hotel room. Rios told the officer she had just left a hotel.

The officer opened the small box and saw inside "a clear baggie containing a white crystalline substance, which I immediately recognized, due to my training and experience, as methamphetamine." The officer detained Rios outside of the vehicle and later determined the weight of the baggie was 7.4 grams. Other police eventually arrived, and a search of the vehicle was conducted. Three working digital scales were found in the vehicle along with five more identical small green boxes that were all empty.

The officer searched the baggie taken from the passenger door and found 11 white pills. On some of the pills the officer could clearly see "DAN" on one side, and "5513" on the other. Based on his training and experience, the officer believed the pills to be carisoprodol (Soma). The officer verified this by doing a search on a public website used to identify medications. Rios did not have a prescription for the pills.

Police also found a hotel card in Rios' vehicle. The officer went to the

3

nearby hotel and learned Rios was registered in one of the rooms. The officer went to that room and knocked on the door. A woman came out in the hallway, had a brief discussion with the officer, went back into the room to retrieve her purse, and then left.[1]

Later that morning, a hotel employee collected some personal items left in the now vacant room. The employee saw several small clear plastic baggies in the room, and an aluminum beverage can that seemed odd and did not feel right. The employee opened the can and discovered a false compartment. When asked what was inside, she said, "I'm not too familiar with drugs, but it seemed like little rocks or stuff inside. So I proceed to call front desk and call back the [police department]."

The officer returned to the hotel and opened the can with the false compartment. The officer found "two clear plastic baggies, both of which contained a white crystalline substance which I instantly recognized, due to my training and experience, as methamphetamine." The two baggies were later weighed at 19.08 grams, and 2.10 grams. When the officer returned to the station, he used a TruNarc device to test the substances seized from the vehicle and the hotel. The TruNarc laser device indicated the tested substances were methamphetamine and carisoprodol pills.

*Court Proceedings*

The prosecution filed an amended information charging Rios with three crimes: possession for sale of methamphetamine, transportation for sale of methamphetamine, and simple possession of carisoprodol.

Prior to a jury trial, Rios made an oral motion challenging the reliability of the TruNarc laser device evidence. In a pretrial hearing, the Irvine police officer testified about how the TruNarc device analyzes suspected controlled substances (the proceedings will be summarized in detail in the discussion section of this opinion). The court ruled

---

[1] Further details of this encounter were excluded from evidence prior to trial.

4

the TruNarc evidence was admissible at trial. The jury found Rios guilty of the three charged crimes. The trial court granted Rios three years of formal probation.


II

DISCUSSION

Rios claims the trial court erred when it admitted the TruNarc testimony because it was based on a new scientific technique and there was no evidence of the technique's general acceptance in the scientific community. We agree.

Whether evidence qualifies as a new scientific technique is a pure question of law that we review de novo. (*People v. Jackson* (2016) 1 Cal.5th 269, 316.) Whether the technique has gained general acceptance in the relevant scientific community is a mixed question of law and fact. (*People v. Davis* (2022) 75 Cal.App.5th 694, 712–713.)

In this discussion we shall: A) review relevant legal principles regarding the admissibility of new scientific evidence (the *Kelly* rule); B) summarize the trial court proceedings; and C) analyze the facts as applied to the law.


*A. Relevant Legal Principles*

The proponent of the evidence has the burden to establish the reliability of a new scientific technique. (*Kelly*, *supra*, 17 Cal.3d 24.) In *Kelly*, a victim reported receiving several anonymous, threatening phone calls. (*Id*. at p. 28.) Police recorded two threatening phone calls to the victim, and later "obtained a tape recording of defendant's voice during a telephone call (the control tape)." (*Ibid*.) A police officer listened to copies of the threatening tapes and the control tape, and determined all of the recordings were made by the same person, based on "spectrographic analysis." (*Ibid*.) Defendant was charged with extortion. After the police officer testified in a pretrial hearing, "the trial court ruled that voiceprint analysis had attained sufficient scientific approval, and that [the officer's] testimony identifying defendant as the extortionist was properly

5

admissible." (*Id*. at p. 29.)  Defendant was convicted of extortion at trial, but the California Supreme Court reversed, finding the trial court's admission of the police officer's testimony about voiceprint analysis was in error, and the error was prejudicial. (*Id*. at p. 40, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Relying primarily on well-established federal law (*Frye v. United States* (1923) 54 App.D.C. 46 (*Frye*)), the Supreme Court held the "admissibility of expert testimony based upon the application of a new scientific technique" requires a showing that:  1) the reliability of the technique is generally accepted in the relevant scientific community; 2) the expert testifying about the technique is properly qualified as a witness on the subject; and 3) the person who performed the test in the particular case used correct scientific procedures.[2]  (*Kelly*, *supra*, 17 Cal.3d at pp. 30–31.)

"We conclude that the People failed to carry their burden of establishing the reliability of voiceprint evidence.  We emphasize, however, that our decision is not intended in any way to foreclose the introduction of voiceprint evidence in future cases. We simply circumscribe, carefully and deliberately, the admission of evidence born of new techniques until the time when there is demonstrated solid scientific approval and support of the new methods.  The *Frye* test was not designed to eliminate reliance upon scientific evidence, but to retard its admissibility until the scientific community has had ample opportunity to study, evaluate and accept its reliability.  [Citation.]  Although the present record is insufficient to justify the admissibility of voiceprint evidence, the future proponent of such evidence may well be able to demonstrate in a satisfactory manner that the voiceprint technique has achieved that required general acceptance in the scientific community." (*Kelly*, *supra*, 17 Cal.3d at pp. 40–41.)

The *Kelly* rule requires that it be applied when scientific techniques are

---

[2] This rule used to be referred to as the *Kelly-Frye* rule.  But as a result of changes in federal evidentiary law, the rule is now generally known in California as the *Kelly* test or the *Kelly* rule.  (See *People v. Bolden* (2002) 29 Cal.4th 515, 545.)

sought to be introduced that are "'new,' novel, or "'experimental,'"" and "convey a "'misleading aura of certainty.'"" (*People v Stoll* (1989) 49 Cal.3d 1136, 1155–1156 (*Stoll*).) The rule applies to a ""'limited class'"" of expert testimony based "on a technique, process, or theory which is *new* to science, and even more so, the law.'"" (*People v Cowan* (2010) 50 Cal.4th 401, 470.) "*Kelly* applies to unproven techniques or procedures that appear 'in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury,' such as 'machines or procedures which analyze physical data,' because '[l]ay minds might easily, but erroneously, assume that such procedures are objective and infallible.'" (*People v. Therrian* (2003) 113 Cal.App.4th 609, 614.)

"In determining whether a new scientific test or process has . . . received general acceptance by recognized experts in the scientific field to which it belongs, . . . a court may, and should, take judicial notice of the case law and comments on the particular field of scientific endeavor and of the articles from reliable sources that appear in scientific journals and other publications . . . ." (2 Witkin, Cal. Evidence (6th ed. 2023) Demonstrative, Experimental, and Scientific Evidence, § 45, pp. 57–58.)

However, given "the weight of authority and the cautious, 'conservative' nature of *Kelly*, we conclude that testimony by police officers regarding the mere *administration* of the test is insufficient to meet the general acceptance standard required by *Kelly*." (*People v. Leahy* (1994) 8 Cal.4th 587, 609.)

B. *Trial Court Proceedings*

Prior to trial, defense counsel made an oral motion in limine challenging "the presumptive tests for methamphetamine and carisoprodol, I think is how you pronounce it. And I have -- I just want to find out from this officer what -- well, full foundation in terms of those tests and what he did and how -- how it was done, to figure out if they're *reliable or not*." (Italics added.)

7

The prosecutor called the Irvine police officer to the stand and said, "I specifically want to ask you about a tool that . . . is included in your report that you tested controlled substances that you found in this case. I believe the name of the tool is the thermodynamic narcotics identifier."

The officer responded: "The thermodynamic TruNarc identifier is a handheld electronic device. This device emits a single laser. This laser enables officers to test various substances. And what it does is it excites a bond inside of a molecule. This bond will emit a light that is measurable by the laser. The laser will then analyze the substance, and it stores about 450 different substances in its library, and it comes back with an accurate reading of what the substance is." The officer said it is a handheld "rectangular electronic device, blue in color, with a large LED screen with a laser on the top left portion of the device."

The officer testified he had been working for the Irvine Police Department for six years, the TruNarc device had been purchased about three years ago, and he had used the device over 300 times. The officer said he had received PowerPoint training as well as hands on training. The officer testified that the training was done by a sergeant in the special investigative unit, which maintains the department's TruNarc device, which is stored in the evidence room.

The officer said that when using the TruNarc device, he turns on the power and then enters a passcode that is provided to each of the officers. The officer said once the passcode is entered, he points the device at a substance, and then hits a button that says, "Analyze." After giving the device time to analyze the substance, "it will come back with a reading in clear English of what the substance is."

The prosecutor asked the officer, "on October 12, 2019, do you know if it the device was working properly?" The officer said he knew it was working properly because: "It turned on as normal, it was stored as normal, there doesn't appear to be any malfunctions, the screen was intact, the laser was intact, it emitted the red laser as it

8

normally does, and it came back with a clear reading." The officer then described how he used the device in this case "on the carisoprodol pills as well as the initial bag of methamphetamine located inside of the vehicle and the two additional baggies of methamphetamine located inside of the hotel."

On cross-examination, when asked to describe the science behind the device, the officer testified that beyond what he had already described, "I don't know the exact science behind it." The officer said that after testing the methamphetamine in this case, the device displayed the word, "methamphetamine." But the officer said he did not know whether the device is able to distinguish between other substances that may contain amphetamine. The officer said he does "not know if it comes up with the complete chemical breakdown of each substance." The officer testified he did not believe the device needed to be periodically calibrated.

At the conclusion of the testimony, counsel for Rios argued, "I would object to him testifying as to the results of the machine based on what he testified to. And he's not in a position to know whether the machine is operating properly because he doesn't even know whether or not it ever might need to be recalibrated, and he doesn't know if it can differentiate the difference between amphetamine related compounds." Counsel said, "there's a difference between somebody being able to testify to some result that they see," as opposed to "*scientific knowledge*." (Italics added.)

The prosecutor argued that the officer "did a presumptive test to confirm what his opinion was as to the controlled substance is relevant to that. And I think that the People should be allowed to put on both -- both areas of testimony from the officer. [¶] As the Court knows, *we do not have a criminalist coming in*, and I don't think it would be cumulative." (Italics added.)

The trial court ruled, "so long as sufficient foundation is laid for him to give an opinion as to what the substance was, that would be admissible." The court said, "I think the objection to both the opinion and the device goes towards the weight of that

9

evidence, not the admissibility of that evidence.  So as a preliminary matter, based on the 402 motion, the Court will allow the testimony relating to the device.”

### C.  Application and Analysis

In this part of the discussion, we will analyze:  1) whether the challenge to the officer's testimony was preserved for appeal; 2) whether the TruNarc test is a new scientific technique, and if the prosecution met the requirements of the *Kelly* rule; and 3) the question of prejudice as to the methamphetamine and carisoprodol convictions.

#### 1.  The Kelly *rule challenge was not forfeited for purposes of appeal.*

Generally, an issue is forfeited on appeal if the defendant failed to make a timely and specific objection on the ground asserted on appeal.  (*People v. Jackson*, *supra*, 1 Cal.5th at p. 328.)  “A proper objection must ““fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.’”””  (*Ibid*.)

“While it is true ordinarily that an objection to evidence must be sufficiently specific to inform the court of the scope of the objection, nevertheless, where the record shows . . . that all the parties, including the court, must have understood the purpose of the objection, it will not be said that the objection failed of its purpose.” (*People v. Boggess* (1924) 194 Cal. 212, 232; see also *People v. Scott* (1978) 21 Cal.3d 284, 290 [“the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented”].)

An appellant may forfeit a *Kelly/Frye* issue on appeal by not first raising it in the trial court.  (*People v. Diaz* (1992) 3 Cal.4th 495, 527–528 (*Diaz*).)  In *Diaz*, the defendant was a nurse who killed “12 patients by injecting them with massive overdoses of lidocaine, a drug commonly used in hospitals to control rhythm disturbances in the

heart." (*Id*. at p. 517.) At a capital murder trial, prosecution experts testified about the effects of lidocaine over the defendant's objections on two grounds: "'lack of foundation'" and "hearsay." (*Id*. at p. 527.) On direct appeal, defendant argued that "the testimony of the prosecution's experts did not satisfy the *Kelly/Frye* test." (*Id*. at p. 526.) The Supreme Court held: "These [trial] objections were not based on the *Kelly/Frye* rule, and did not seek to exclude the type of evidence to which defendant now objects. Accordingly, neither objection preserved the *Kelly/Frye* issue." (*Id*. at p. 527.)

However, within the *Diaz* opinion, the Supreme Court distinguished an earlier case where it found that the *Kelly/Frye* issue had been preserved for appellate review, despite the lack of a specific objection on *Kelly/Frye* grounds. (*Diaz*, *supra*, 3 Cal.4th at p. 528, citing *People v. Shirley* (1982) 31 Cal.3d 18 (*Shirley*).) "In *Shirley*, the defendant 'moved to exclude all testimony of the . . . witness that was the result of her having been hypnotized,' arguing that 'the People were attempting "to expand hypnosis into an area [in] which they cannot lay adequate foundation for its *reliability*" as a tool for refreshing recollection.' [Citation.] By challenging the *reliability of the scientific technique* in question, the defendant in *Shirley* properly preserved the [*Kelly/Frye*] issue for appeal. There was no similar objection in this case." (*Diaz*, at p. 528, italics added.)

Here, although Rios' counsel did not explicitly object to the admission of the TruNarc evidence on the grounds of the *Kelly* rule, counsel did explicitly challenge whether the TruNarc device's analysis of both substances was "*reliable* or not." (Italics added.) (See *Shirley*, *supra*, 31 Cal.3d 18.) Counsel also argued that the officer was not qualified to testify as to his *scientific knowledge* of the device.

Further, based on the prosecutor's questions on direct examination, and the officer's responses regarding the laser measuring the molecular bonds of the substances tested by the TruNarc device, it does appear that the prosecutor and the trial court were fairly appraised that Rios was challenging the scientific underpinnings of the TruNarc identification evidence. (See *People v. Boggess, supra*, 194 Cal. at p. 232 ["where the

11

record shows . . . that all the parties, including the court, must have understood the purpose of the objection, it will not be said that the objection failed of its purpose"].)

Moreover, the prosecutor noted that she was not calling a criminalist to testify at trial, implying that the prosecution was relying on the TruNarc evidence to present purportedly scientific evidence to the jury. (See *United States v. Vega-Ortiz* (9th Cir. 2016) 822 F.3d 1031, 1035 ["it is well-settled that California treats the identity of a controlled substance as an element that must be found by the jury"].)

In short, we find Rios sufficiently preserved the *Kelly* issue in the trial court for purposes of appellate review. In any event, even if we were to find the *Kelly* issue had been forfeited on appeal, we would likely exercise our discretion to address the issue. (See *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [an appellate court has authority to reach a forfeited claim]; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 146 [a reviewing court may exercise its discretion to consider a forfeited claim to forestall an ineffective assistance of counsel claim].)

*2. The* Kelly *rule applies, and its required elements were not proven.*

"While the standards imposed by the *Kelly/Frye* rule are clear, the definition of a 'new scientific technique' is not." (*Stoll*, *supra*, 49 Cal.3d at p. 1155.) Application of the rule "has often been determined by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or "'experimental,'" convey a "'misleading aura of certainty.'"" (*Id*. at pp. 1155–1156.)

"This approach has produced two discernible themes. First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law. The courts are willing to forego admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. This all-or-nothing approach was adopted in full recognition that

12

there would be a "'considerable lag'" between scientific advances and their admission as evidence in a court proceeding." (*Stoll*, *supra*, 49 Cal.3d at p. 1156.)

"The second theme in cases applying *Kelly/Frye* is that the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Stoll*, *supra*, 49 Cal.3d at p. 1156; see, e.g., *People v. Mitchell* (2003) 110 Cal.App.4th 772, 779–780 [canine scent identification lineup involving the scent from bullet casings recovered from a crime scene and transferred to a "scent pad" with a "scent transfer unit" was a novel device that should have been scrutinized under *Kelly*]; *In re Amber B.* (1987) 191 Cal.App.3d 682, 691 [use of anatomically correct doll to detect child abuse was subject to a showing of general acceptance in the scientific community].)

In our research, we found no California opinions establishing the reliability of the TruNarc identification device. Indeed, when we expanded our search to all state and federal opinions (published and unpublished), we only found 18 cases that included the term "TruNarc." And in only two of those opinions did the reliability of the TruNarc device appear to be at issue. (See *United States v. Folks* (W.D. Pa. 2020) 452 F.Supp.3d 238, 248 [police officer "could not explain why the TruNarc results showed a different type of fentanyl analogue than the laboratory tests"]; *Fort Peck Tribes v. Hair* (Fort Peck C.A., Oct. 22, 2021, No. AP 815) 2021 WL 4948005 at p. *2 [court ordered "that this case be remanded . . . with the requirement that the lower court make an independent examination of the reliability of the TRUNARC test and the qualifications of the officer administering it prior to admitting any results into the trial of the Defendant"].)

The Irvine police officer testified in the pretrial hearing that the TruNarc device scans a substance with a laser, analyzes the substance, and then "comes back with an accurate reading of what the substance is." The officer similarly told the jurors that

13

the TruNarc device "is able to analyze the [laser] light and come back with a positive reading for what controlled substance it is." The officer further opined that the substances he found in Rios's vehicle and her hotel room were the controlled substances methamphetamine and carisoprodol, based, in part, on the results of the TruNarc test.

In sum, we find the TruNarc laser test results admitted into evidence were based on a new scientific technique within the meaning of the *Kelly* rule because there is an absence of case law in this area, and the identification of controlled substances through the use of a purportedly accurate laser test is exactly the kind of evidence that conveys to a jury an """"aura of certainty."""" (*Stoll, supra,* 49 Cal.3d at pp. 1155–1156.)

Having found that the *Kelly* rule applied to the admission of the TruNarc evidence in Rios' jury trial, in order for that evidence to have been admissible, it was the prosecution's burden to prove: 1) the reliability of the laser light technique used in the TruNarc device is generally accepted in the relevant scientific community; 2) the Irvine police officer who testified about the laser light technique was properly qualified as a witness on the subject; and 3) the officer used correct scientific procedures when administering the TruNarc test. (See *Kelly, supra,* 17 Cal.3d at p. 30.)

The *Kelly* rule is a conjunctive test, meaning the prosecution was required to prove all three elements to the trial court judge under a preponderance of the evidence standard. (See *People v. Davis, supra,* 75 Cal.App.5th at pp. 710–712.) The Irvine police officer in this case appeared to be fully capable of using the TruNarc device as he was trained. But the officer could not possibly testify as to the acceptance of TruNarc test results within the relevant scientific community (nor was he asked). And it does not appear the officer was qualified to testify about the underlying scientific principles, which ostensibly involve laser technology. (See *People v. Leahy, supra,* 8 Cal.4th at p. 609 ["testimony by police officers regarding the mere administration of the test is insufficient to meet the general acceptance standard required by *Kelly*"].)

Thus, we hold that the trial court erred when it admitted into evidence the

testimony of the Irvine police officer regarding the results of the TruNarc test.

The Attorney General argues, "the TruNarc is a presumptive drug testing device." He then cites opinions for the proposition: "Presumptive drug tests are not new to the law, having been admitted into evidence in cases as far back as the 1970's." [3] But we agree with Rios that: "The mere adjective 'presumptive' to describe a test does not in turn establish its scientific reliability and general acceptance."

Indeed, all the opinions cited by the Attorney General involve a chemical test known as a Valtox presumptive narcotics test, which appears to be a significantly different kind of narcotics test than a laser light test. (See, e.g., *People v. Bautista* (2014) 223 Cal.App.4th 1096, 1099–1100 [suspected narcotics tested by Valtox test].) A Valtox test is a liquids-based chemical test, consisting of "a selection of chemical reagents, some of which produce a characteristic color when combined with" a suspected controlled substance. (*State v. Ostwald* (Mont. 1979) 591 P.2d 646, 648.)

Again, the Irvine police officer said that the TruNarc device emits a laser light that "excites a bond inside of a molecule. This bond will emit a light that is measurable by the laser. The laser will then analyze the substance, and it stores about 450 different substances in its library, and it comes back with an accurate reading of what the substance is." We find that the scientific technique utilized by the TruNarc device (a laser light) is meaningfully distinct from other existing narcotics identification tests we have been able to locate in case law (chemical tests). Therefore, the TruNarc testing device is, in fact, new to the law. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 316 ["To be new, a technique must be meaningfully distinct from existing techniques"].)

---

[3] We understand the term "presumptive test" to mean a preliminary test that is ordinarily used by a police officer to establish probable cause to make an arrest. Generally, after a positive presumptive test, the suspected controlled substance is then sent out to a laboratory for confirmatory testing. (See, e.g., *People v. Galfund* (1968) 267 Cal.App.2d 317, 320.) In this case, the record does not disclose whether the suspected controlled substances were ever sent to a laboratory, or why a criminalist was not called to testify.

15

To reiterate, we find the TruNarc test is based on a new scientific technique and the prosecution failed to show its reliability or general acceptance within the relevant scientific community within the meaning of the *Kelly* rule. Thus, we hold that the TruNarc evidence was improperly admitted in Rios' jury trial.

### 3. *The prejudicial effect differs as to the two substances.*

The erroneous admission of scientific evidence in violation of the *Kelly* rule is evaluated under the California Constitution. (*Kelly*, *supra*, 17 Cal.3d at p. 28.) That is, a miscarriage of justice (prejudice) should only be declared when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) Under *Watson*, the entire trial record should be examined, including all of the facts, and the entirety of the jury's verdicts. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

When an information charges a crime involving a controlled substance, proof of the identity of the substance is an essential element of the offense. (*People v. Davis* (2013) 57 Cal.4th 353, 359–362 [a jury could not properly infer that a seized substance was a controlled substance based solely on its chemical name].) "Ordinarily the narcotic character of a substance is proved by a trained expert who has made a chemical analysis thereof." (*People v. Galfund, supra,* 267 Cal.App.2d at p. 320.)

However, "chemical analysis is not always required to establish the identity of a controlled substance. The essential elements of possession of a controlled substance "'may be established circumstantially.'"'" (*People v. Mooring* (2017) 15 Cal.App.5th 928, 943 ["Chemical test results are routinely introduced at trial to establish the illegal nature of a controlled substance, but they are not required"]; *People v. Bailey* (1991) 1 Cal.App.4th 459, 462–463 [a trained narcotics officer's "testimony establishes that the substance in question was cocaine base"]; *People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369 ["the nature of a substance, like any other fact in a criminal case, may be proved

16

by circumstantial evidence"]; *People v. Marinos* (1968) 260 Cal.App.2d 735, 738–739 [police officer's opinion that cigarette smoked by defendant contained marijuana constituted sufficient evidence that defendant possessed marijuana].)

Here, the Irvine police officer testified that he had extensive training and experience in the area of narcotics investigations, which included a 20-hour enhanced narcotics identification class. Further, the officer attended an additional 20-hour class in which the officer actually manufactured methamphetamine in a controlled setting. The officer also testified he had encountered methamphetamine over one thousand times during his prior narcotics investigations. And in this particular investigation, the officer said that when he observed the white, crystalline substances in Rios' car and in her hotel room, the officer said he immediately recognized the substances as methamphetamine based on his training and experience.

The officer's expert opinion was further corroborated by Rios' admission that the substance in her car was methamphetamine.[4] Additionally, there was other corroborating evidence including the nature of the packaging, the hiding of the substance in the hotel room, the presence of three digital scales in the car, and other indicia that Rios, in fact, possessed and transported methamphetamine for the purpose of selling it. The hotel employee, who apparently had little familiarity with narcotics, also suspected the distinctive white crystals were illegal drugs and immediately called the police.

We find that if the TruNarc evidence had not been improperly admitted at trial, it is not reasonably probable that Rios would have received a more favorable result as to the two methamphetamine convictions (possession for sales and transportation for sales). (See *Watson*, *supra*, 46 Cal.2d at p. 836.) This is based on the totality of the other

---

[4] The prosecution needed to prove beyond a reasonable doubt: "The defendant knew of the substance's nature and character as a controlled substance." (CALCRIM No. 2302.) And the prosecution also needed to separately prove: "The controlled substance was methamphetamine . . . ." (CALCRIM No. 2302.)

evidence, which circumstantially identified the white crystalline substances as methamphetamine. The other circumstantial evidence included: 1) the officer's immediate identification of the distinctive white crystalline substances as methamphetamine based on his extensive training and experience (prior to the use of the TruNarc device at the police station); 2) the admission by Rios that she, in fact, possessed methamphetamine; 3) the indicia of sales of methamphetamine; and 4) the hotel employee's immediate suspicion that the white crystals were illegal drugs. But we cannot make that same finding as to the carisoprodol conviction (simple possession).

The Irvine officer testified that he recognized the 11 pills he discovered in the plastic bag in Rios' car as carisoprodol based on their color and markings, as well as his training and experience. However, the officer said he then "verified my *belief* with a search on pillid.com." (Italics added.) The officer explained: "Pill ID is an open-source website that anyone can use. It is a common tool used by law enforcement to identify prescription pills. Most pills have markings on them. You can type in the color, shape, and markings and discover what they are." The officer did not estimate how many times he had seen carisoprodol pills in his prior investigations, and there was no evidence about the reliability of the public website.

Here, the record reveals the officer did not emphatically recognize the 11 pills as a controlled substance (as he had with the suspected methamphetamine), the officer did not testify that he had extensive prior experiences identifying carisoprodol pills (as he had with methamphetamine), and the officer's testimony was based, in part, on a public website (the reliability of which was not established). Therefore, we think it is reasonably probable Rios would have received a more favorable result as to the carisoprodol conviction in the absence of the improper TruNarc evidence (either a hung jury or an acquittal on that count). (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

Thus, we reverse Rios' conviction for simple possession of carisoprodol.

## III

## DISPOSITION

The carisoprodol conviction for simple possession is reversed.  In all other respects, the judgment is affirmed.


                                        MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOTOIKE, J.